UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BLACKHAWK SECURITY, INC. and RICHARD VERRILL, | : : : | NO. 3:03CV2101 (MRK) |
| Plaintiffs, | : : : : | |
| v. | : : | |
| TOWN OF HAMDEN, CONNECTICUT and ROBERT NOLAN, ITS CHIEF OF POLICE, IN HIS INDIVIDUAL AND OFFICIAL CAPACITY, | : : : : : | |
| Defendants. | : | |

## MEMORANDUM OF DECISION

In this lawsuit, Plaintiffs Blackhawk Security, Inc. ("Blackhawk") and its chief executive officer, Richard Verrill, sue the Town of Hamden ("Hamden") and its Chief of Police Robert Nolan for imposing a policy that requires uniformed police officers to be present to control traffic at all roadside construction sites in Hamden. Plaintiffs assert that this policy effectively bars them from providing traffic control services to businesses conducting roadside work in Hamden, thereby depriving Plaintiffs of their rights to substantive due process and to equal protection under the Fourteenth Amendment. Plaintiffs also assert a state law tortious interference claim against Defendants. Currently pending before the Court is Defendants' Motion for Summary Judgment [**doc. #15**]. For the reasons stated below, the Court GRANTS Defendants' motion.

I.

The following facts, drawn from the submissions of the parties, are undisputed.[1] Blackhawk provides traffic control services to businesses such as construction contractors and utility companies in Connecticut. *See* Defs.' 56(a)(1) Stmt. ¶ 5; Pls.' 56(a)(2) Stmt. ¶ 5. Blackhawk's traffic control employees are commonly referred to as "flaggers" or "flagmen." Plaintiff Richard Verrill is the chief executive officer and sole shareholder of Blackhawk. *See* Defs.' 56(a)(1) Stmt. ¶ 2; Pls.' 56(a)(2) Stmt. ¶ 2. Defendant Robert Nolan is Hamden's Chief of Police. *See* Defs.' 56(a)(1) Stmt. ¶ 4; Pls.' 56(a)(2) Stmt. ¶ 4.

Connecticut law permits private flaggers such as those employed by Blackhawk to provide traffic control services on public highways. *See* Regs., Conn. State Agencies § 13b-17-28 (2005) ("When portions of the traveled way are made dangerous for the movement of vehicles or pedestrians, a sufficient number of uniformed police officers *or other traffic control personnel* shall be employed . . . to direct traffic safely through the areas.") (emphasis added). Hamden's legislative council has enacted an ordinance that is more specific than state law. Hamden's ordinance provides, in relevant part, that:

> [U]se of a uniformed police officer(s) shall be required for all excavations, construction work and repairs on public streets, road closures and work performed adjacent to roadways that significantly restrict said roadway to traffic and create a traffic hazard, or when construction is performed upon any part of town or state roadways when deemed a hazard by the chief of police or his/her designee.

---

[1] *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment [doc. #16] ("Defs.' Mem."); Defendants' Local Rule 56(a)(1) Statement [doc. #17] ("Defs.' Rule 56(a)(1) Stmt."); Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment [doc. #25] ("Pls.' Mem. in Opp'n"); Plaintiffs' Local Rule 56(a)(2) Statement [doc. #26] ("Pls.' 56(a)(2) Stmt."); and Defendants' Reply Memorandum of Law in Support of Defendants' Motion for Summary Judgment [doc. #30] ("Defs.' Reply").

Hamden Code of Ordinances § 97.03.

Hamden police officers wear their full police uniforms and badges when they are engaged in traffic control assignments at roadside construction sites.  *See* Nolan Aff., Ex. A attached to Defs.' Reply, at ¶ 4.  Although these assignments are billed as overtime, the police officers are paid through the police department and they are covered by Hamden's Workers Compensation and health insurance policies while serving on traffic duty.  *Id*.  Apparently, Hamden then recovers the costs of providing police officers for traffic control services by billing the party needing such services (such as a utility or construction company working on or near the road).  *See id*; Caputo Aff., Ex. J attached to Pls.' Mem. in Opp'n, at ¶¶ 13-14.  Blackhawk's flaggers also wear uniforms and they are trained and certified.  *See* Verrill Dep., Ex. H attached to Pls.' Mem. in Opp'n, at 9.  Specifically, the flaggers receive approximately twenty-four hours of safety training and they are certified by Blackhawk's training center which has been approved by the National Safety Council.  *See* Caputo Aff., Ex. J attached to Pls.' Mem. in Opp'n, at ¶ 10; Nat'l Safety Council Certificate, Ex. C attached to Pls.' Mem. in Opp'n.  However, Plaintiffs do not claim that the training and certification that Blackhawk provides it flaggers is equivalent to the training that Hamden police officers receive.  Furthermore, unlike Hamden police officers, Blackhawk's flaggers are not authorized to arrest or issue citations to pedestrians or motorists who travel by, through or near construction sites.  *See* Defs.' 56(a)(1) Stmt. ¶ 11; Pls.' 56(a)(2) Stmt. ¶ 11.

## II.

This Court has had several recent occasions to describe at length the standard for granting summary judgment and there is no need to repeat, yet again, what is set forth in those decisions.

*See, e.g.*, *Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 73 (D. Conn. 2004); *Lynch v. McNamara*, 342 F. Supp. 2d 59, 64-65 (D. Conn. 2004); *Brown v. Reg. Sch. Dist. 13,* 328 F. Supp. 2d 289, 292 (D. Conn. 2004). Suffice it to say that in assessing Defendants' motion for summary judgment in this case, the Court has applied the standards described at greater length in those decisions.

### III.

### A. Federal Claims

At oral argument, Plaintiffs abandoned their substantive due process claim against Defendants. Therefore the Court GRANTS summary judgment to Defendants on Plaintiffs' substantive due process claim.

That concession leaves as the only remaining federal claim Plaintiffs' assertion that Defendants violated their Fourteenth Amendment equal protection rights under the so-called "class of one" theory articulated by the Supreme Court in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Despite the language used in their opposition brief, Plaintiffs' counsel clarified at oral argument that Plaintiffs do not challenge Hamden's ordinance on its face. To the contrary, Plaintiffs agree there are situations where work performed adjacent to a roadway restricts the flow of traffic and poses a hazard that would warrant the presence of a police officer. Rather, Plaintiffs allege that Chief Nolan has imposed a de facto policy of requiring uniformed police officers to control traffic at *all* roadside construction sites in Hamden, regardless of traffic hazards or roadway restriction. This policy indirectly prevents Plaintiffs' from providing flagging services in Hamden because many smaller jobs require only one person for traffic control and the companies which typically employ Blackhawk will not pay for both a police officer and a

Blackhawk flagger at such sites. Plaintiffs further claim that on at least two occasions Hamden police officers directly ordered Blackhawk's private flaggers off of a work site. *See* Verrill Dep., Ex. H attached to Pls.' Mem. in Opp'n, at 25-26.

In Plaintiffs' view, Blackhawk's flaggers and Hamden police officers are similarly situated when it comes to providing traffic control services and Chief Nolan's policy of treating the flaggers differently from police officers is arbitrary and unreasonable,[2] particularly in light of the fact that state law does not, on its face, distinguish between private flaggers and police officers and Hamden's ordinance purports to require uniformed police officers only for "hazardous" work sites. *See* Regs., Conn. State Agencies § 13b-17-28; Hamden Code of Ordinances § 97.03. Rather than challenge Chief Nolan's policy as violating state law or Hamden's ordinance, Plaintiffs contend that the policy violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

As a preliminary matter, the Court notes that Defendants vehemently dispute that Chief Nolan has imposed any such policy. Defendants point to the fact that when asked at his deposition, "What objective criteria would you utilize to make a determination as to whether or not it is was necessary to have a police officer present versus a civilian flag person?" Chief Nolan responded, "My decision would be based on whether or not that particular vehicle or equipment . . . or men are creating a hazardous situation." Nolan Dep., Ex. G attached to Pls.' Mem. in Opp'n at 31-32. Thus, Defendants argue, Chief Nolan makes case-by-case determinations on whether a police officer is needed at a roadside construction site. Defendants also dispute Plaintiffs'

---

[2] Plaintiffs' counsel clarified at oral argument that Plaintiffs do not make a claim of malice or bad faith on the part of Defendants.

contention that Blackhawk's flaggers have been barred from working at construction sites. Chief Nolan testified at his deposition that "I have no problem with a certified flagman being hired by a company . . . The problem I would have is that if there is not a police officer being hired." *Id*. at 38.

This Court cannot resolve these factual disputes on summary judgment, and therefore, for purposes of the present motion, the Court assumes the truth of Plaintiffs' assertions regarding Chief Nolan's alleged policy. Even assuming Plaintiffs are correct about the existence of this alleged de facto policy, however, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim because Plaintiffs have not, as a matter of law, established that Blackhawk's flaggers are similarly situated to Hamden police officers.

As this Court explained in *Piscottano v. Murphy*, No. 3:04CV682 (MRK), 2005 WL 1424394, at *8 (D. Conn. Jun. 9, 2005), the Second Circuit has recently had occasion to refine and restate a plaintiff's burden on an *Olech* "class of one" claim. *See Neilson v. D'Angelis*, 409 F.3d 100, 105-06 (2d Cir. 2005). The Second Circuit in *Neilson* overturned a jury verdict for the plaintiff on an *Olech* claim and ruled that "[the plaintiff] did not, as a matter of law, satisfy the similarly situated requirements of an Equal Protection 'class of one' claim." *Id*. at 101. The court held that "in order to succeed on an *Olech* claim, the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high," and in particular, much higher than is required for the use of comparators in Title VII claims. *Neilson*, 409 F.3d at 104. Thus, plaintiffs pursuing *Olech* claims must demonstrate that they were treated differently from someone who is " '*prima facie identical in all relevant respects*.' " *Id*. at 104 (emphasis added) (quoting *Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002)). The Second

Circuit explained that the reason for demanding this high standard of similarity in *Olech* claims is that the "existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that lack any reasonable nexus with a legitimate governmental policy." *Neilson*, 409 F.3d at 104.  In effect, "[t]he similarity and equal protection inquiries are . . . virtually one and the same in . . . a 'class of one' case." *Id*.

Accordingly, the Second Circuit restated the requirements that an *Olech* plaintiff must establish as follows:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to the degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.

*Neilson*, 409 F.3d at 105.  Based on the undisputed facts of this case, the Court concludes that no rational jury could find that Plaintiffs had satisfied the first prong of the *Neilson* test.

Plaintiffs cannot demonstrate that their flaggers are *prima facie* identical in all relevant respects to Hamden police officers.[3]  *Id*. at 104.  There are obvious and relevant differences between the private flaggers employed by Blackhawk and Hamden police officers that more than justify their differential treatment on the basis of an undisputedly legitimate government policy – namely ensuring the safety of roadside construction workers, motorists and pedestrians.  For

---

[3] As Defendants noted in their summary judgment papers, it is not entirely clear that Plaintiffs can properly state an equal protection claim based on a comparison between flaggers and police officers since no flaggers are named as parties in this case. *See* Defs.' Reply at 4-5. Nevertheless, for purposes of resolving Defendants' summary judgment motion, the Court will assume, without deciding, that the relevant comparison is between Blackhawk's employees and the Hamden police officers.

example, it is undisputed that unlike police officers, Blackhawk's flaggers do not have the authority to issue citations or to arrest motorists who violate traffic rules or who are involved in a motor vehicle accident as they pass work sites. *See* Defs.' 56(a)(1) Stmt. at ¶ 11; Pls.' 56(a)(2) Stmt. at ¶ 11. Indeed, Chief Nolan testified without contradiction at his deposition that the ability of police officers to "take the appropriate action" in the case of a traffic violation or an accident is a significant factor motivating his desire to have a police officer present at construction sites. Nolan Dep., Ex. G attached to Pls.' Mem. in Opp'n, at 38-39. Nor do Plaintiffs seriously dispute that Blackhawk's flaggers are hired principally to protect the workers, whereas Hamden police officers have as their responsibility the protection of both the workers and passing motorists and pedestrians. Indeed, Mr. Caputo, Blackhawk's Vice President, testified at his deposition that his employees are "not allowed to interfere with anything that concerns traffic . . . all our job is to do is to protect the men that are doing the sites. That's all. We don't direct traffic, we don't do nothing like that." Caputo Aff., Ex. L attached to Pls.' Mem. in Opp'n, at 31. As Plaintiffs put it in their brief, "It should be noted that the responsibilities of a 'flagger' *do not encompass a law enforcement function*, but to reduce traffic hazards, providing protection to those utility or private construction employees . . . working on or near a roadway." Pls.' Mem. in Opp'n at 3 (emphasis added). Furthermore, Plaintiffs' counsel conceded at oral argument (as he must) that the presence of a uniformed police officer at a work site is likely to have a deterrent effect on passing motorists that a private flagger's presence simply does not offer. *See* Nolan Aff., Ex. A attached to Defs.' Reply, at ¶ 6 ("When a police officer is at a construction site, he provides a visible police presence to deter criminal or other unlawful activity in the area.").

Thus, by Plaintiffs' own admissions, Blackhawk's flaggers differ from Hamden police

officers in at least three relevant and material respects: (1) they cannot issue citations or make arrests; (2) their focus is on the safety of the workers and not on motorists and pedestrians; and (3) their presence lacks the deterrent benefits of a police officer's presence. Seeking to distance themselves from these admissions, Plaintiffs offer various arguments suggesting, *at best*, that the differences between police officer and private flaggers do not mandate differential treatment.

For example, at oral argument, Plaintiffs' counsel asserted that although police officers, unlike private flaggers, can issue citations and make arrests, in practice a police officer stationed at a construction site would rarely leave the site to pursue a motorist violating traffic safety laws and would instead call in another officer to issue a citation or make an arrest. However, there is nothing in the record to support Plaintiffs' version of the facts. Any even if there were support for this assertion, it would not diminish either the fact that police officers are authorized to take action when they observe a violation or the resulting deterrent effect that their presence provides. Plaintiffs also emphasize the fact that Hamden police officers are not paid for their traffic control assignments as part of their regular payroll, but instead receive a separate overtime paycheck for such work. *See* Caputo Aff., Ex. J attached to Pls.' Mem. in Opp'n, at ¶ 13. Yet Plaintiffs again fail to explain how the manner in which police officers are paid for their traffic control duties alters the fact that the police officers have law enforcement responsibilities and privileges that set them far apart from private flaggers. In sum, Plaintiffs arguments are unpersuasive.

The Court emphasizes that the relevant question for purposes of Plaintiffs' *Olech* claim is not whether Defendants' alleged decision to require police officers to control traffic at all roadside construction sites is imprudent or ill-advised. *See Bizzarro v. Miranda*, 394 F.3d 82, 88-89 (2d Cir. 2005) ("*Olech* does not empower federal courts to review government actions for

correctness."). Rather, the relevant question is whether flaggers and uniformed police officers are so similar that *no rational person* could regard their differential treatment as justified on the basis of a legitimate governmental policy. *See Neilson*, 409 F.3d at 105. On the undisputed facts, the Court concludes no reasonable juror could find that Plaintiffs have satisfied this onerous standard. Accordingly, the Court grants summary judgment to Defendants on Plaintiffs' Fourteenth Amendment equal protection claim.

## B. State Law Claims

In addition to their federal claims, Plaintiffs also allege state law tortious interference claims against both Defendants. However, at oral argument, Plaintiffs abandoned their tortious interference claim against the Town because under Connecticut law, municipalities are immune from liability for the intentional or willful torts of their employees. *See Pane v. City of Danbury*, 267 Conn. 669, 685 (Conn. 2004) (citing Conn. Gen. Stat. § 52-557n(a)(2)(A)). Tortious interference is clearly an intentional tort. *See Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 27 (2000). Accordingly, the Court grants summary judgment to Hamden on Plaintiffs' tortious interference claim.

That leaves Plaintiffs' state law tortious interference claim against Chief Nolan. However, rather than addressing the merits of that claim, the Court declines to exercise supplemental jurisdiction over it. "Under 28 U.S.C. § 1367(c)(3), district courts 'may decline to exercise supplemental jurisdiction over a claim . . . if the district court has dismissed all claims over which it has original jurisdiction.' " *Ametex Fabrics, Inc. v. Just In Materials, Inc.*, 140 F.3d 101, 105 (2d Cir. 1998). Having granted summary judgment to both Defendants on all of Plaintiffs' federal claims – the only claims over which this Court had original jurisdiction –

considerations of judicial economy, convenience, fairness, and comity weigh against exercising supplemental jurisdiction over Plaintiffs' remaining state law tortious interference claim against Chief Nolan.  *See In re Merrill Lynch Ltd. P'ship Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) ("This Court and the Supreme Court have held that when the federal claims are dismissed the 'state claims should be dismissed as well.' ") (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, (1966)); *Martin v. Univ. of New Haven, Inc.*, 359 F. Supp. 2d 185, 189 (D. Conn. 2005) (declining to exercise supplemental jurisdiction after granting summary judgment on federal claims); *Kasper v. City of Middletown*, 352 F. Supp. 2d 216, 237 (D. Conn. 2005) (same). Therefore, the Court dismisses Plaintiffs' tortious interference claim against Chief Nolan without prejudice to Plaintiffs' right to pursue that claim in state court if Plaintiffs chose to do so.

## IV.

The Court GRANTS Defendants' Motion for Summary Judgment [**doc. #15**] to both Defendants with respect to Plaintiffs' Fourteenth Amendment substantive due process and equal protection claims set forth in Count I of the Complaint and to Defendant Town of Hamden with respect to Plaintiffs' state law tortious interference claim set forth in Count II of the Complaint. However, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law tortious interference claim against Hamden Chief of Police Robert Nolan, and therefore, the Court DISMISSES that claim against Chief Nolan without prejudice to renewal in state court. **The Clerk is directed to enter judgment accordingly and to close the file.**

IT IS SO ORDERED.

/s/   Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut on: July 20, 2005**.